# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# HAMMOND DIVISION

| | |
|---|---|
| SANDRA RINCON, as Administrator of the Estate of Rosalio Rincon, Deceased, | )<br>)<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | ) No. 2:10-CV-268 PS<br>) |
| UNITED STATES OF AMERICA, | )<br>) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

The United States seeks summary judgment on this Tort Claims Act case arising out of the shooting death of Rosalio Rincon [DE 44]. The administrator of Rosalio's estate, Sandra Rincon, originally sued the United States, a number of other government agencies, and federal law enforcement officers under the Federal Tort Claims Act and 42 U.S.C. § 1983, alleging that DEA agents used unnecessary deadly force during a September 24, 2007 traffic stop that killed Rincon [DE 1]. I granted the Defendants' motion to dismiss the § 1983 claim, which resulted in the dismissal of all claims except the Federal Tort Claims Act claim against the United States. [DE 35]. Because there are questions of fact that remain for a jury to sort out, the United States' Motion for Summary Judgment is **DENIED**.

## BACKGROUND

On September 19, 2007, a grand jury indicted Rosalio Rincon on drug conspiracy, possession, and distribution charges, and an arrest warrant was issued [DE 45-4 at 2, 5-11]. On September 24, 2007, a DEA-led task force of federal, state, and local law enforcement agents put several residences associated with Rincon under surveillance, with the intention of arresting Rincon pursuant to the arrest warrant [DE 45-1 at 3-6, 22; DE 45-2 at 19-20; DE 45-3 at 5; DE

45-4 at 1-2]. Task Force Agent Jeremy Ogden, a Hobart police officer assigned to the DEA task force and a deputized DEA agent, Task Force Officer Matthew Moore, and Special Agent Mark Keller were all attempting to locate Rincon that day [DE 1 at ¶ 3; DE 45-1 at 2-3, 6; DE 45-2 at 2, 6].

While conducting surveillance at one of the residences associated with Rincon, Moore and Ogden, in their separate vehicles, observed a white SUV drive up to the residence, and a Hispanic male carrying a white plastic bag enter the residence. [DE 45-1 at 4, 7; DE 45-2 at 10; DE 45-4 at 3]. The person returned to his car empty-handed and left, and Moore and Ogden, in communication with the other agents working on the investigation, left the residence and followed the SUV to a Home Depot in the area [DE 45-1 at 6-7; DE 45-2 at 11-12]. DEA Special Agent Mark Keller was also dispatched to the Home Depot to help with surveillance, and Ogden enlisted the help of Hobart Police Officer Richard Zormier, who was driving a marked black and white police car, to assist with a possible traffic stop [DE 45-1 at 7-9; DE 45-2 at 11; DE 45-3 at 3, 5; DE 45-4 at 3].

At approximately 4:00 p.m., while they were following the white SUV away from the Home Depot, Moore, Ogden, Keller and Zormier received word from other agents that individuals later identified as Rincon and Anthony Willis had left the residence that had previously been under surveillance in a Lincoln Continental [DE 45-1 at 7-8; DE 45-2 at 13-14; DE 45-4 at 3]. Other agents, including James Lilley, who was heading the investigation against Rincon, followed the Lincoln to the Westfield Shopping Mall [DE 45-1 at 9; DE 45-2 at 14-15; DE 45-4 at 1, 3-4]. The agents followed Rincon and Willis inside the shopping mall [*Id.*]. At the same time, Moore, Ogden, Keller, and Zormier lost the white SUV when it pulled a quick u-turn, so they proceeded to the area of the shopping mall to help with the surveillance of Rincon

and Willis [DE 45-1 at 8-9; DE 45-2 at 13-14].

Rincon and Willis walked outside of the shopping mall, waited there for a few minutes, and a purple 2005 Nissan automobile drove up and stopped in front of them [DE 45-1 at 9-10; DE 45-2 at 15; DE 45-4 at 4]. Rincon walked away from the car and Willis got inside for about a minute, and then got out of the Nissan [DE 45-2 at 15; DE 45-4 at 4]. At that point, the agents, believing that they had just witnessed a drug transaction, decided to have Zormier perform a traffic stop and to arrest Rincon and Willis [DE 45-2 at 15; DE 45-4 at 4]. This decision was a departure from the initial operating plan, which called for an arrest of Rincon in or near one of the residences he was associated with, likely in the early morning, for safety purposes [DE 45-1 at 10, 12; DE 45-2 at 7, 15-16].

Rincon and Willis got back into the Lincoln and drove away from the shopping mall [DE 45-1 at 9; DE 45-2 at 19]. Keller, Ogden, Moore, and Zormier followed the Lincoln out of the shopping mall and onto westbound U.S. Highway 30 [DE 45-1 at 12-13; DE 45-2 at 19; DE 45-3 at 10]. Rincon was driving the Lincoln, and at the intersection of Route 30 and Mississippi Street, he made a right-hand turn onto northbound Mississippi, and then made a left-hand turn into the driveway of a Wickes Furniture store on the northwest corner of the intersection [DE 45-1 at 12-13, 22; DE 45-2 at 19-20; DE 45-3 at 12 ]. Rincon then made an immediate sharp, left-hand, counterclockwise u-turn so that the Lincoln was now facing outward in the Wickes driveway, in an eastbound direction, poised to pull back out onto Mississippi [*Id.*].

Zormier was not able to follow Rincon into the Wickes lot (he may have been following another Lincoln vehicle), and instead stopped his car and turned his flashing lights on, blocking southbound traffic on Mississippi Street [DE 45-1 at 13; DE 45-2 at 19-21; DE 45-3 at 12, 26]. Ogden pulled his vehicle across the southbound lanes of Mississippi Street, and stopped his car

3

so that he was facing the front of the Rincon's Lincoln, in a northwesterly direction, with his front bumper approximately one-and-a-half to three feet away from Rincon's front bumper [DE 45-1 at 15-16; DE 45-2 at 20-21, 23-24]. Moore pulled into the Wickes parking lot, cut his wheel to the left, and in an effort to trap Rincon, stopped his vehicle behind and perpendicular to the Lincoln, with his car facing south, his driver's side abutting Rincon's trunk [DE 45-1 at 13-14, 23; DE 45-2 at 21]. There were approximately two to three feet between Rincon's trunk and Moore's vehicle [DE 45-2 at 23]. Keller was nearby, but his exact location during the incident was unknown [DE 45-2 at 24; DE 45-3 at 13].[1]

Rincon and Willis looked directly at Zormier's police car with its lights on [DE 45-1 at 13; DE 45-3 at 26]. Ogden got out of his vehicle, with his police badge displayed around his neck and his service weapon, a Glock 40 millimeter, drawn and in his right hand, and approached the front hood of Rincon's Lincoln, using his left hand to motion downward, repeatedly shouting "Police. Stop," "stop the car," and "put your hands in the air. You are under arrest" [DE 45-1 at 15, 17; DE 45-2 at 4, 23-26, 34; DE 45-3 at 14; 16-17, 25]. Moore also had his weapon drawn, gave verbal commands to Rincon, and was approaching Rincon's driver's side door from the rear [DE 45-1 at 15-17]. The door to Ogden's vehicle may have been open [DE 45-1 at 16; DE 45-2 at 24].

According to Ogden, he got out of his car, which put him in front of Rincon's Lincoln, towards the passenger side of the car, but as he approached, the Lincoln moved forward and then stopped, putting Ogden more in line with the center of the hood [DE 45-2 at 25]. Ogden was then close enough to Rincon's vehicle that he was able to hit his left hand on the hood of the car,

---

[1] Keller is now deceased and there no deposition given by him is in the record [DE 45 at 3].

and he again yelled at Rincon to stop the car [DE 45-2 at 25, 38-39]. Rincon and Ogden made eye contact, and Rincon looked back and forth between Ogden and Zormier's marked police car in the street [DE 45-2 at 25, 39-40; DE 45-3 at 26-27]. Willis complied with police commands and put his hands up in the air, but Rincon moved his hands to the top of the wheel [DE 45-2 at 25]. Moore testified that Rincon's vehicle lurched forward three times, moving about a foot-and-a-half forward each of the first two times, and that after the first lurch, Ogden began backpedaling and sideways towards Rincon's left side, away from the Lincoln [DE 45-1 at 17-18, 23.] On the third lurch, the Lincoln began to move forward quickly – Moore heard a sound that indicated to him that Rincon had pressed very hard on the gas pedal, and Ogden testified that that was the point at which he began to backpedal away from the Lincoln [DE 45-1 at 17; DE 45-2 at 25-27, 39-40].

Ogden believed that Rincon intended to hit him [DE 45-2 at 30-31, 39]. Ogden fired his gun and shot at Rincon through the driver's side window of the Lincoln, shattering the window and hitting Rincon on his left side [DE 45-2 at 26-28]. Moore described Ogden as "flailing to the northeast" at the time he shot at Rincon [DE 45-1 at 18]. Ogden does not recall where he was standing in relation to the Lincoln when he fired his gun, but acknowledged that the bullet, which came from the gun he was holding in his right hand, straight ahead of him and even with his right shoulder, went through the driver's side window of the Lincoln and entered Rincon's body on the left side of his chest area [DE 45-2 at 26-28, 31].

Ogden does not know if Rincon began to turn the wheel to the right "a split second" before he shot, or if Rincon turned the wheel when he was shot [DE 45-2 at 31]. Ogden was not hit by Rincon's Lincoln [DE 45-1 at 18; DE 45-2 at 27, 31]. From the time the agents got out of their cars to the time the shot was fired, less than a minute expired [DE 45-1 at 21].

5

The Lincoln continued to move forward and to the right, in a southeasterly direction, into the turn lane for southbound Mississippi to eastbound Route 30 and stopped next to a guardrail [DE 45-1 at 17, 23; DE 45-3 at 23]. Agents recovered bags of what appeared to be drugs from an area near where the Lincoln stopped [DE 45-1 at 24; DE 45-4 at 4]. Rincon died from the gunshot wound [DE 45-5 at ¶ 7].

**DISCUSSION**

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court must look at the evidence as a jury might, construing the record in the light most favorable to the nonmovant and avoiding the temptation to decide which party's version of the facts is more likely true. *Payne v. Pauley,* 337 F.3d 767, 770 (7th Cir. 2003).

The Federal Tort Claims Act ("FTCA") imposes liability in circumstances ". . . where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act of omission occurred." *Morisch v. United States*, 653 F.3d 522, 530 (7th Cir. 2011) (citing 28 U.S.C. § 1346(b)(1); *Midwest Knitting Mills, Inc. v. United States*, 950 F.2d 1295, 1297 (7th Cir. 1991). Thus, in this case, liability will be determined by reference to Indiana law.

Under Indiana law, a "law enforcement officer is justified in using reasonable force if the officer reasonably believes that the force is necessary to effect a lawful arrest," but may only use deadly force when he "has probable cause to believe that deadly force is necessary . . . to effect an arrest of a person who the officer has probable cause to believe poses a threat of serious

bodily injury to the officer or a third person." I.C. 35-41-3-3(b)(1)(B). The "reasonableness" prong of the Indiana statute is governed by the United States Constitution's Fourth Amendment objective reasonableness standard. *O'Bannon v. City of Anderson*, 733 N.E.2d 1, 3 (Ind. App. 2000) (citing *Graham v. Connor,* 490 U.S. 386, 388 (1989)).

A police officer's use of deadly force is a seizure within the meaning of the Fourth Amendment and accordingly must be reasonable. *Tennessee v. Garner,* 471 U.S. 1, 7 (1985). The relevant inquiry is "whether the officers' actions [were] 'objectively reasonable' in light of the facts and circumstances confronting them." *Graham,* 490 U.S. at 395. The officer's subjective good or bad intentions do not enter into the analysis. *Id*. This means that courts must view the matter "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. Put another way, "the right question is how things appeared to objectively reasonable officers at the time of the events, *not* how they appear in the courtroom to a cross-section of the civilian community." *Bell v. Irwin*, 321 F.3d 637, 640 (7th Cir. 2003). Moreover, the reasonableness calculation "must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Scott v. Edinburg*, 346 F.3d 752, 756 (7th Cir. 2003) (citing *Graham*, 490 U.S. 396-97).

Deadly force may be used if the officer has probable cause to believe that the armed suspect "poses a threat of serious physical harm, either to the officer or to others." *Muhammed v. City of Chicago*, 316 F.3d 680, 683 (7th Cir. 2002) (citing *Garner*, 471 U.S. at 11-12); *Sherrod v. Berry*, 856 F.2d 802, 805 (7th Cir. 1988) (en banc)). And to be sure, "an automobile may be used as a deadly weapon." *Scott*, 346 F.3d at 757. When a police officer "believes that a

suspect's actions places him, his partner, or those in the immediate vicinity in imminent danger of death or serious bodily injury, the officer can reasonably exercise the use of deadly force." *Sherrod*, 856 F.2d at 805 (emphasis omitted).

Here, the United States posits two theories to justify Ogden's use of deadly force against Rincon. First, that Rincon was attempting to run over and kill Ogden, which made it reasonable for Ogden to shoot Rincon to protect himself. Second, and more generally, the United States argues that it was objectively reasonable for Ogden to shoot Rincon to protect Moore and other members of the general public. If either of these are true, then Ogden's use of deadly force would have been objectively reasonable and thus permissible.

This case closely parallels *Scott v. Edinburg*, a case that, to my surprise, neither party cited. In *Scott*, a police officer saw Scott trying to steal his car. 346 F.3d at 754. The officer ran towards the car and stopped three to five feet from the rear bumper, yelling at Scott to stop. *Id.* The driver backed the car up towards the officer (who tried to run away), stopped, and drove forward, and the officer shot at the driver, killing him. *Id.* It was unclear whether the first, fatal shot was fired while the car was still backing up, when it was stopped, or when it was moving forward, which was a material factual question, because "[i]f the fatal shot was fired while Mr. Scott was driving away, the argument that Officer Edinburg was compelled to fire in order to protect himself would be significantly weakened." *Id.* at 754, 757-58.

The same essential question has been left unanswered here: was the fatal shot fired when Rincon was heading at Ogden, or after he had passed him by? When viewing the evidence in the light most favorable to the Plaintiff, there are disputed issues of material fact that prevent me from being able to determine that Ogden's use of deadly force to protect himself was reasonable under the circumstances. Quite simply, it is not clear at what point in time Rincon turned the

8

steering wheel, where Ogden was standing in relation to the Lincoln when he pulled the trigger and shot Rincon, and whether Rincon was in fact coming at Ogden *at the moment* that Ogden pulled the trigger. These factual issues are material because "[w]hen an officer faces a situation in which he could justifiably shoot, he does not retain the right to shoot at any time thereafter with impunity." *Scott*, 346 F.3d at 757 (quoting *Ellis v. Wynalda*, 999 F.2d 243, 247 (7th Cir. 1993) (alteration in original)).

*Ellis* provides a good example of a threatening situation abating. In *Ellis*, the Seventh Circuit reversed a grant of summary judgment where an officer shot a burglary suspect in the back after the suspect threw something at the officer and started to flee. 999 F.2d at 245. The Court found that since the suspect started to flee, the threat had dissipated – albeit just an instant before – such that a jury would have to resolve whether the officer's actions were justified. *Id.* at 247.

Reviewing the evidence in the light most favorable to the plaintiff, if Ogden was holding his gun straight out from his right shoulder, and the bullet that he fired entered the driver's side window and hit Rincon in the left side of his chest, it is difficult to understand how Rincon could have been driving straight at Ogden and *not* turning his wheel prior to being shot. This is a disputed question of material fact that must be resolved at trial.

While there is no question that the situation was evolving and potentially dangerous, the fact that Ogden discharged his weapon and the bullet went through the *driver's side window*, as opposed to the windshield, calls into question whether the very real danger that Ogden was in had, quite literally, passed him by. If the bullet had gone through the windshield, indicating that Ogden was directly in the path of the vehicle, and thus squarely in harm's way, he would have reasonably been in apprehension for his life and his use of force may have been reasonable. *See*

9

*Estate of Starks v. Enyart*, 5 F.3d 230, 233-34 (7th Cir. 1993) ("... if an officer was faced with a fleeing felon driving toward him, the officer could justifiably shoot the driver ..."). But the trajectory of the bullet through the driver's side window of Rincon's vehicle presents a factual question on whether or not Ogden was in harm's way, and justified in using deadly force, "at the moment" he pulled the trigger. *Maravilla v. United States,* 60 F.3d 1230, 1233 (7th Cir. 1995); *see also Ellis*, 999 F.2d at 247 (officer would have been justified in shooting "*at that moment*" when the fleeing suspect threw a bag at him, but not after) (emphasis in original).

So the key dispute for trial here will be whether Ogden was in peril from Rincon's vehicle at the time that he pulled the trigger. If he was, then he would have acted reasonably in using deadly force and shooting Rincon. If he was not, then the factfinder could conclude that it was not objectively reasonable for Ogden to use deadly force to subdue Rincon. Additionally, there are also questions of fact as to whether Rincon's car did in fact present "a threat of serious physical harm." After all, the evidence seems rather clear that Rincon on three occasions nudged the car forward in an apparent effort, not to harm Ogden, but to simply get him out of the way. And it is plain that Ogden was able to get out of the path of the car without being struck. *See Enyart*, 5 F.3d at 234 n.1 (whether moving vehicle presented a threat of serious physical harm was not conclusively established where officer was able to get out of vehicle's path). Second, "it is unclear how fast the [Lincoln] was moving, even with a floored accelerator, from a full stop" after such a short distance to where Ogden was standing, when he had just been close enough to the Lincoln that he was touching it. *Id*.

The United States also makes a somewhat cursory argument that Ogden's use of deadly force was objectively reasonable because if Rincon had not been shot, "he could have" backed up and hit Moore, and he was in a busy area at a busy time of day and "[t]hird parties would

10

have been in peril" [DE 45 at 12]. The United States is correct that an officer's use of deadly force is objectively reasonable when he "believes that a suspect's actions places him, his partner, or those in the immediate vicinity in imminent danger of death or serious bodily injury." *Sherrod*, 856 F.2d at 805.

But this is where the parallels between this case and *Scott* end: in *Scott*, the Seventh Circuit found that the presence of over a dozen bystanders in the parking lot where Scott was driving recklessly made it "objectively reasonable for Officer Edinburg to perceive that the bystanders . . . were at risk of injury from Mr. Scott." 346 F.3d at 759. In this case, there are no facts that indicate in any way that Rincon might put Moore in danger by putting his car in reverse, or that he was about to do so. To the contrary, all of the officers present at the scene testified that Rincon was accelerating *forward*, in an attempt to escape onto Mississippi and US 30, which is exactly where his vehicle ended up. And, unlike in *Scott,* there were no facts presented here that there were any bystanders who were in danger from Rincon. [DE 45-2 at 32].

Instead, the government makes vague references to all drivers on the roads in the area being in danger [DE 45 at 12]. But this is highly speculative especially when I consider the evidence, as I must, in the light most favorable to the Plaintiff. There is simply no concrete evidence that Rincon's actions put others in the "*immediate* vicinity in *imminent* danger of death or serious bodily injury." *Sherrod*, 856 F.2d at 805 (emphasis added). Instead, the most likely inference to be drawn from Rincon's actions is that he was simply trying to get away; there is no evidence that he was hellbent on harming the public at large.

In sum, while I fully appreciate the danger of the position that Task Force Agent Ogden was in, I nonetheless believe that a factfinder could conclude that Ogden's use of deadly force

11

was unreasonable since Ogden shot Rincon through the side window at a point in time when Ogden may no longer have been in danger, and there is scant evidence that anyone else was in peril.

## CONCLUSION

For all of these reasons, and taking the light in the evidence most favorable to the Plaintiff, I conclude that a reasonable jury could find that Ogden's use of deadly force was unreasonable. Accordingly, the United States' Motion for Summary Judgment [DE 44] is **DENIED**.

**SO ORDERED.**

ENTERED: June 1, 2012

s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT
